RHODES, Respondent, v. HOLLADAY-KLOTZ LAND AND LUMBER COMPANY, Appellant.

St. Louis Court of Appeals, March 1, 1904.

1. **PLEADING: Replication: Evidence.** Evidence is properly admitted to prove averments of new matter in a replication, which go to contradict the allegations of the answer, although the petition contains no averments on the subject.

2. **CONTRACT: Construction of.** The contract, for breach of which suit was brought, provided that the defendant was to furnish logs at the plaintiff's saw mill in numbers "limited by the reasonable convenience" of the defendant, to endeavor to supply logs sufficient to enable the plaintiff to run his saw mill all the time and cut such lumber as the defendant could sell

each month, and "to log said mill to its capacity to cut, limited only by the amount of lumber the said party of the first part (defendant) should be able to sell at satisfactory prices." *Held,* the contract did not constitute the defendant judge as to the quality of the timber to be supplied to plaintiff, but that the purpose of the parties was to manufacture and sell marketable lumber. *Held* further, the phrase, "satisfactory price," in the contract should be a price which would yield the defendant a reasonable profit. *Held* further, the contract required the defendant to furnish timber from which could be manufactured salable lumber and to make reasonable efforts to put sound and salable lumber an the market, and if, by such efforts, sales at reasonable profits could be made, defendant was bound to furnish sufficient logs to keep the plaintiff's mill continuously running. *Held* further, that the plaintiff was obliged, when furnished with such sound lumber, to saw it in a workmanlike manner and of such dimensions as required by defendant.

3. **PLEADING: Replication: New Matter.** Under section 607, Revised Statutes of 1899, new matter may be set up in a reply, if not inconsistent with the petition, which constitutes a defense to a counterclaim set up by the defendant in answer.

4. ———: ———: ———. But the reply can not be used in aid of the petition to engraft thereon a material allegation which has been omitted, and it is error to instruct the jury authorizing a recovery by plaintiff on the proof of such allegation.

5. **CONTRACT: Damages for Breach of.** The measure of damages in actions for breach of contract is a matter of law for the court to declare in its instructions, and not a matter for the jury to speculate upon.

6. ———: ———: ———. In an action for failure to keep plaintiff's saw mill supplied with logs, according to contract, the measure of damages is the loss of the net profits which plaintiff would have realized from the operation of his mill if he had been supplied with logs according to the terms of the contract.

Appeal from Wayne Circuit Court.—*Hon. F. R. Dearing,* Judge.

Reversed and remanded.

*James F. Green* and *John H. Raney* for appellant.

(1)    By the contract the defendant was constituted the judge as to the quality of logs to be furnished, and

as to when prices for the lumber were satisfactory, and it is not liable where no intentional violation of the contract is shown. Blaine v. Knapp & Co. 140 Mo. 250; Mullaly v. Greenwood, 127 Mo. 146, Lawson on Contracts, sec. 409; Bass v. Henderson, 105 La. 691; Machine Co. v. Smith, 50 Mich. 565; Manufacturing Co. v. Ellis, 35 N. W. 841; Printing Co. v. Thorp, 36 Fed. 416; Singerly v. Thayer, 108 Pa. 291; Williams v. Railroad, 85 Mo. App. 110; Koehler v. Bull, 94 Mich. 496; Brown v. Foster, 113 Mass. 136. (2) The testimony as to the character of logs furnished was not admissible under the allegations of the petition. Woods v. Campbell, 110 Mo. 573; Redpath v. Manning, 42 Mo. App. 114; (3) Plaintiff must recover on the cause of action stated in the petition and none other; and instructions which permit a recovery outside of the specific cause of action stated in the petition are erroneous. Chitty v. Railway, 148 Mo. 65; Colliott v. Am. Mfg. Co., 71 Mo. App. 163; Milling Co. v. Transit Co., 122 Mo. 277; Yarnell v. Railroad, 113 Mo. 570; Mason v. Railroad, 75 Mo. App. 10; (4) By instruction No. 1 given for plaintiff, he was permitted to recover on purely defensive matter, set up in the replication to defendant's answer, and not upon the cause of action stated in the petition, namely, the alleged failure to supply a sufficient quantity of logs. No recovery can be had on matter set up in a reply. Crawford v. Spencer, 36 Mo. App. 78; Hill v. Mining Co., 119 Mo. 9; Mahoney v. Reed, 40 Mo. App. 99; McMahon v. Jenkins, 69 Mo. App. 287; Wonderly v. Christian, 91 Mo. App. 168; Stepp v. Livingston, 72 Mo. App. 177. (5) Plaintiff's first instruction is in direct conflict with defendant's fourth instruction. It is reversible error to give conflicting instructions, no matter at whose instance they are given. Bluedorn v. Railway, 108 Mo. 439; Frank v. Railway, 57 Mo. App. 186; Redpath v. Manning, 42 Mo. App. 112; Stone v. Hunt, 94 Mo. 475; Matowsky v. Hannibal. 35 Mo. App. 70; Frederick v. Allgaier, 88 Mo. 603. (6) Instructions must be based

on both the pleadings and the evidence. Marr v. Baker, 92 Mo. App. 651; Tyler v. Hall, 106 Mo. 313; Paddock v. Sones, 102 Mo. 226; Wilkerson v. Eiler, 114 Mo. 245. (7) The court committed error in permitting the jury to view the lumber stacked in the yards of defendant. 1 Thompson on Trials, sec. 881; State v. Smith, 42 Tex. 444; State v. Bostwick, 61 Ga. 635; Holladay v. Jackson, 21 Mo. App. 670. (8) Plaintiff's second instruction fails to inform the jury as to the proper measure of damages, and it is also erroneous in assuming that there had been a breach of the contract on part of defendant. Morrison v. Yancy, 23 Mo. App. 670; Hyatt v. Railroad, 19 Mo. App. 302; Bridge Co. v. Schabacher, 57 Mo. 582.

*Smith & Anthony* and *Munger & Munger* for respondent.

(1) The contract meant that appellant company should furnish respondent with logs, "at Skidway at his mill," out of which he could manufacture marketable lumber, which appellant could sell on the markets at reasonable prices for that kind of material or it meant nothing. Leiweke v. Jordan, 59 Mo. App. 624; McManus v. Shoe Clothing Co., 60 Mo. App. 218; County of Johnson v. Wood, 84 Mo. 509; Williams v. Railroad, 153 Mo. 534; 1 Beach on Mod. Cont., secs. 708 and 711; 11 Amer. Dig. (Cent. Ed.) 718 to 735. (2) The construction of a contract does not depend upon what either party thought, but upon what both agreed. Chitty on Cont. (1894) 127; Bank v. Kennedy, 84 U. S. 28; Knapp v. Simon, 49 N. Y. 17; Brunheld v. Freeman, 77 N. C. 128. (3) The contract sued on implies that the logs to be furnished by appellant should be such that marketable lumber could be made out of them by respondent. The furnishing of the logs was a condition precedent, and the implication attached to the subject-matter of the contract and was a part of

such condition. Bersch v. Sanders, 37 Mo. 106; Jones v. Walker, 13 B. Monroe 165. Oakley v. Martin, 62 Amer. Dec. 50; Mains v. Haight, 14 Barb. 81; 1 Beach on Mod. Cont., sec. 710; Kauffman v. Raeder, 54 L. R. A., 253; Turner v. Mellier, 59 Mo. 536; Randolph v. Frick, 57 Mo. 404. (4) Appellant could not make it impossible for respondent to manufacture a marketable grade of lumber by the inferior quality of logs furnished, and then because the product could not be sold for good market prices, refuse to sell the output of his mill on the ground that the prices were not satisfactory. Under the circumstances of this case what were satisfactory prices was a question of law. Berthold v. Electric Con. Co., 165 Mo. 304; Pope & Co. v. Best, 14 Mo. App. 502; Mullally v. Greenwood, 127 Mo. 138; 1 Beach on Mod. Cont., sec. 104, notes 3 and 4. "The law will determine for defendant when he ought to be satisfied," said Chancellor KENT in Folliard v. Wallace, 2 Johns. 395. (5) The failure of appellant to furnish a reasonably good quality of logs out of which fair marketable lumber could be manufactured, rendered the performance of the contract practicably impossible and was a partial repudiation of it, whereupon respondent had his action for the loss of his contract—his damages being the difference between the contract price and what it would have cost to perform the uncompleted contract. Chapman v. Railroad, 146 Mo. 493. (6) The law implying that the logs to be furnished, should be fit for the manufacture of marketable lumber; and appellant alleging in his answer that it furnished logs out of which lumber could be made as contemplated by the contract, which allegation respondent's reply denied, with the averment added, that the logs were bad and unfit to use for the manufacturing of salable lumber, made an issue as to the quality of logs supplied. To prove or disprove this issue, testimony was admissible to show the character of logs furnished. Contract implied that reasonably good logs would be delivered.

Lawson on Cont., p. 61, sec. 57.   Petition was aided by answer and reply.   Garth v. Caldwell, 72 Mo. 630; Fisher v. Lead Co., 156 Mo. 485; Ricketts v. Hart, 150 Mo. 74.   Replication was no departure from the petition, but it explains and supports it, and controverts and avoids the new matter set up in the answer.   Kimberlin v. Carter, 49 Ind. 111; 6 Am. and Eng. Ency. Plead. and Prac., p. 465, notes 5 and 6.   (7)   Where the answer by way of new matter and a counterclaim pleads the contract (declared on in the petition) and sets forth particular provisions of it, the plaintiff in his reply may plead to such "new matter" by denying it, or confessing and avoiding it, and may introduce new matter if not inconsistent with the original cause of action, in examination and support of it, and that controverts and avoids the new matter set up in the answer.   Cravens v. Hillilan, 73 Mo. 528; Hoover v. Railroad, 16 S. W. 482.   The instruction on the measure of damage given by the court is assailed.   It is not as general as the instruction in the Browning case, and it was approved.   Browning v. Railroad, 124 Mo. 71; Wheeler v. Bowels, 163 Mo. 409; Boettger v. Ins. Co., 124 Mo. 104; Barth v. Railroad, 142 Mo. 555; Robertson v. Railroad, 152 Mo. 393.

### STATEMENT.

The suit is on the following contract and modification thereof:

"This agreement, made and entered into this fifteenth day of July, 1899, by and between the Holladay-Klotz Land & Lumber Company, of the county of Wayne and State of Missouri, party of the first part, and Charles M. Rhodes, of the county of Wayne and State of Missouri, party of the second part.

"Witnesseth, that the said party of the first part for and in consideration of the stipulations, agreements and promises of the party of the second part, herein-

after set forth, agrees to put in and maintain at its own expense the necessary railroad side tracks and switches to the saw mill proposed to be erected by party of the second part, to be located about one mile east of Greenville, on the land of Finis Stephens, said party of the second part to furnish right of way for same; the said party of the first part further agrees to furnish and supply oak saw logs, delivered at Skidway at said mill, in numbers to be limited by the reasonable convenience of the said party of the first part, and make such deliveries by the sales of such oak lumber that the said party of the first part may be able to make from time to time. It being understood that the said party of the first part will endeavor to supply logs sufficient to enable said sawmill of the party of the second part to run all the time and cut such lumber as said party of the first part can sell each month; said party of the first part agrees to log said mill to its capacity to cut, limited only by the amount of lumber said party of the first part shall be able to sell at satisfactory prices.

"Said party of the first part agrees to pay said party of the second part $3 per thousand feet, log scale, for sawing and loading said lumber at said sawmill. All lumber accumulated in sawing, that does not apply on orders, to be stacked on yard until ordered out, then to be loaded without cost to party of the first part. All slabs, edgings and waste material, except such as may be required for fuel to operate said mill, shall be property of party of the second part, and party of the first part hereby agrees to cut slabs, edgings and waste materials into suitable lengths for stove wood, to pile same in ranks in places accessible to teams, or put on cars direct from the mill, as required by party of the first part, without cost to said party of the first part; provided, however, that if said slabs accumulate in greater quantities than desired or can be used by said party of the first part, then said party of the second part to take

them and deduct twenty-five (25) cents per M from price of sawing.

"The said party of the second part agrees to cut at his said sawmill all logs supplied by the said party of the first part, as aforesaid, into such lumber as required by the party of the first part on orders furnished, to keep a competent man in charge of his said sawmill at all times, and to use due care in sawing all logs to the best advantage, and to saw lumber smooth and even; to classify lumber as to grades and sizes; to load the lumber on cars or put it in stacks in workmanlike manner as said party of the first part may direct; to furnish sufficient yard to pile the lumber not immediately shipped; to limit the cut of said mill to the orders and timber of said party of the first part, and to load lumber from stacks to cars as it can be supplied on orders.

"The said party of the first part further agrees to advance to the said party of the second part 75 per cent of the amount earned, as logs are sawed into lumber, the same to be paid in goods and repair work, the balance due to be payable at the end of each month, the same to be ascertained and settled as may be agreed upon by the parties later. Should there be any material decrease in the price or market value of oak lumber, party of the second part agrees to reduce his price so as to stand his proportion of such decrease or loss. This contract to run two years, unless otherwise mutually agreed.

"In testimony whereof, the said parties to these presents have hereunto and also to one copy set their respective hands and seals, at Greenville, Missouri, on the date first above written.

"Holladay-Klotz Land & Lumber Co.

"Per C. C. Rainwater, Pres't. (seal).

"Chas. M. Rhodes, (seal).

"The within agreement is hereby amended by mutual consent of both parties as follows:

"In consideration of party of the second part agree-

ing to haul all wood which he cuts from slabs and waste accumulated in sawing lumber, and piling same along the line of the W. G. & S. L. R. R. on right of way of same, at convenient places to be designated by party of the first part: Party of the first part agrees to furnish to party of the second part necessary cars on their side track, at his mill for the purpose of loading all lumber on said cars as it is being cut by party of the second part, thereby releasing said party of the second part, from that part of his obligation requiring him to pile said lumber on yards, as stated within agreement.''

After stating preliminary matters the petition is as follows:

''Plaintiff states that he has duly and faithfully performed all the conditions of said contract on his part to be performed, and has at all times been ready and able to cut all the logs on said mill when furnished him by defendant; but that defendant has failed to perform its part of said agreement, in that it has failed and refused to supply plaintiff with saw logs sufficient to keep said mill running all of the time, and has thereby caused said mill to be idle a great portion of said time, to-wit, for an aggregate period of two hundred and seventy-five days, to plaintiff's damage in the sum of four thousand four hundred and forty-nine dollars and fifty cents.

''Wherefore, the premises considered, plaintiff prays judgment against defendant for the said sum of four thousand four hundred and forty-nine dollars and fifty cents.

''Plaintiff for another and further cause of action herein states that on the — day of May, 1900, he was employed by the defendant to unload the saw logs from the defendant's cars at plaintiff's mill; that during the time intervening between said date and the first day of January, 1901 plaintiff unloaded for defendant as aforesaid four hundred and twenty-three cars; that his services in in unloading said cars are reasonably worth twenty

cents per car; that though often requested to pay amount, defendant has failed and refused and still fails and refuses to pay the same.

"Wherefore, plaintiff prays for judgment against defendant in the sum of twenty cents per car, aggregating the sum of eighty-four dollars and sixty cents, and the costs of said suit."

After a general denial, except as to matters expressly admitted, the answer is as follows:

"Further answering said petition, defendant says that on the fifteenth day of July, 1899, it entered into a written contract with the plaintiff, by which it was to furnish logs to plaintiff's mill for the purpose of having the same sawed, and defendant says that among the clauses in said contract, are the following, viz.:

" 'That the said party of the first part (the defendant) further agrees to furnish and supply oak saw logs, delivered at Skidway at said mill in numbers to be limited by the reasonable convenience of said party of the first part (the defendant) and make such deliveries by the sale of such oak lumber that the said party of the first part may be able to make from time to time. It being understood that the party of the first part will endeavor to enable said sawmill of the party of the second part to run all the time, and cut such lumber as the party of the first part can sell each month; said party of the first part agrees to log said mill to its capacity, to cut, limited only by the amount of lumber said party of the first part shall be able to sell at satisfactory prices.'

"And the defendant avers that it fully complied with all the requirements of said contract on its part and furnished such logs during the time of the contract; that under the terms of said contract, it was only required to furnish such quantities of logs as it was able to sell at satisfactory prices and it avers that it furnished more logs than it was able to sell, and that, in fact, it now has on hand, of oak lumber, which it has been unable to dispose of, eight hundred thousand feet (800,

·000 ft.) which is still in and about the yards of defendant.

"For further answer and counterclaim to the petition of the plaintiff, defendant says that by the terms of said written contract plaintiff was required to saw and cut at his said mill all logs supplied by defendant into such lumber as required by defendant, and to use due care in sawing all logs to the best advantage, and to saw lumber smooth and even, to classify the lumber as to grades and sizes, and load the lumber on cars or put it in stacks in a workmanlike manner, as the defendant might direct.

"But defendant avers that plaintiff failed to saw and manufacture said lumber in a workmanlike manner, and to saw it smooth and even and failed and neglected to stack it in such workmanlike manner as would protect said lumber from decay and injury, and that in consequence thereof a large amount of lumber was sawed by the plaintiff for which defendant could find no sale, and that a large quantity of the same was piled in an indiscriminate and careless manner, so that it was exposed to the weather and became decayed, mildewed, and portions of it rotted; that in consequence of such negligence and carelessness on plaintiff's part about eight hundred thousand feet (800,000 ft.) of lumber is left upon defendant's hands in a damaged and injured condition, and which can not be sold, except at a loss; that defendant's loss upon said lumber will average four dollars per thousand; that in consequence of the negligence and carelessness of the plaintiff as above set forth, defendant has sustained damages in the sum of three thousand two hundred dollars, for which sum it asks judgment against the plaintiff.

"And for a further counterclaim against plaintiff, defendant says that about the first day of January, 1901, the plaintiff negligently, carelessly and wrongfully set fire to and burned and converted to his own use about

eighty thousand feet (80,000 ft.) of lumber belonging to defendant, which had been sawed by plaintiff, of the reasonable value of eight hundred dollars, for which sum defendant also asks judgment.

"And having fully answered, defendant prays to be discharged."

The material parts of the reply are as follows:

"Further replying, plaintiff avers that the majority of the logs alleged to have been furnished by defendant were furnished in willful disregard of the terms and provisions of the contract, in this, that they were of inferior character; and plaintiff further avers that much of the timber manufactured therefrom was necessarily of a second grade quality, and yet, notwithstanding plaintiff avers that during the life of said contract the demand for oak and for all kinds of lumber for that matter, was so active, and prices so liberal and satisfactory as to have enabled the defendant, with its advantages, to sell or have disposed of the entire output of the plaintiff's mill at fair profits, had defendant endeavored to do so, and had defendant endeavored to comply with the terms and intent of said contract.

"Replying further, plaintiff admits that under the terms of the contract defendant was only required to furnish such quantities of logs as when sawed into lumber could be sold at satisfactory prices, and yet plaintiff avers that defendant was bound by its contract to furnish logs out of which good and salable lumber and millstuff could be manufactured for which good prices could be obtained, which plaintiff avers defendant knowingly refused and failed to do.

"Further answering, plaintiff avers that notwithstanding the inferior logs furnished as aforesaid, yet the lumber cut therefrom was cut in a workmanlike manner, was even and smooth, that is, as much so as the timber of the logs would permit, and such lumber sawed and cut, defendant was by the terms of its contract bound to diligently endeavor to sell, which plaintiff

avers it refused to do, and which plaintiff further avers could have been sold for reasonable profits.

"Plaintiff denies that defendant has on its yards 800,000 feet of oak lumber, as alleged in its answer, coming from plaintiff's mill, which it avers it is unable to dispose of; but, on the contrary, plaintiff states that if it had such an amount of lumber on its yard, it is because defendant has refused to sell same, which it could have sold, as hereinbefore alleged for reasonable prices.

"Further replying with respect to defendant's counterclaims, plaintiff denies each and every allegation, averment and statement therein contained."

In his own behalf plaintiff testified, in substance, that he moved and set up his sawmill at the place designated in the contract and hired help and entered upon the performance of his part of the contract; that some logs were furnished him, but not enough to keep his mill running every work day in any one month during the life of the contract; that he lost, all told, two hundred and fifty days on account of the failure of defendant to furnish saw logs at his mill; that the capacity of his mill was 14,000 feet per day and that he cut on an average 11,600 feet per day; that his profits per day on the latter amount of lumber sawed would be $16.50; that it cost the defendant about $7.75 per thousand to produce the lumber sawed at his mill, and that No. 1 common oak lumber was worth on the market about $12.75 per thousand; that he was never without orders for lumber sent to him by the defendant, but that he was unable to fill many of these orders for want of logs; that there was very little change in the demand for 14 and 16 foot lumber in the spring of 1900, and but little change at any time during that year.

The plaintiff was asked the following questions:

"Q. Can you state, Mr. Rhodes, what was the character of the logs received at the mill, logs that were furnished you by this company?

"The defendant objected to this question for the reason that there was no averment in the petition that there were any defects in the timber furnished the plaintiff. The objection was by the court overruled and to which the defendant then and there excepted.

"A. It was mostly all culled timber.

"Q. What do you mean by that? A. I mean that it was cut off from behind tie makers. They generally cut the best timber and the timber delivered to me was mostly all bad.

"Q. State whether it was doty or rotten?

"Defendant objected to this for the same reasons given above. The objection was overruled, to which defendant at the time excepted.

"A. There was a very large per cent of it that way."

He testified that he cut out or sawed the timber in accordance with the orders given him by the defendant company; that he complained to the company frequently that he did not have logs enough to keep his mill going.

He further stated that there was a demand for a better grade of lumber during the fall of 1899 and year 1900, and in the year 1901, the demand was good. He also produced a number of letters, forwarded to him by the lumber company, with reference to orders to be filled at his mill, which letters were read in evidence.

He made complaints to the officers of the lumber company about their failing to furnish him logs to keep his mill running, and stated that there were times when he had no logs on the ground, and that Mr. Reed, one of the chief officers of defendant, promised to supply him with logs.

He said that the lumber sawed which was not sent out for shipment on orders were properly piled by him; that Mr. Mason, who was manager of the sales department of defendant, said that it was properly piled; that there was no objection made until January, 1901, when

he was required to stack the lumber on strips.   In an-
swer to the question how timber accumulated in the
yards he said that was because much of it was too short
and was graded as No. 2.  In December, 1900, he burned
several thousand feet of lumber that was rotten and
worthless to get it out of the way; that Mr. Klotz, at
that time president of defendant, saw it and told him
not to burn any more.   In May, 1901, he was employed
by Mr. Newby, at that time manager of defendant, to
unload logs, and from that time until the year 1902, he
unloaded 423 cars of logs at his mill; that prior to that
time the defendant had unloaded the cars, and that it
was worth 25 cents a car to unload them; that Mr. Reed,
an employee of defendant, told him that Mr. Klotz,
when he became president of the company, had written
to the salesmen on the road to raise the price of oak
lumber $2 per thousand.   He identified a number of
orders which he was delayed in filling on account of not
having logs to saw.

Plaintiff further testified that a good deal of the
timber furnished him was bad; that a large per cent of
it was doty and rotten and was of different lengths,
and that the unsold lumber (about 800,000 feet) was
12 foot lumber and about seventy-five per cent of it
was sawed out of doty and rotten logs and for this rea-
son could not be sold.

Plaintiff introduced a half dozen or more letters
from certain of defendant's customers complaining that
their orders for oak lumber were not filled and urging
the defendant to hurry up shipments.

Eli Klotz was made president of defendant com-
pany in January, 1901, and took charge of its business.

Plaintiff testified that after Mr. Klotz took charge
he went to Mr. Reed, defendant's timber man, and
called on him for logs; that Reed said to him, "I will
tell you confidentially that you will not get to do much
business for the reason that Mr. Klotz has told the

salesmen to raise the price of oak $2 on the thousand which will result in none being sold.''

On cross-examination plaintiff testified that a great deal of the unsold lumber was of an inferior grade and could not be sold; that the logs from which it was manufactured were too short and many of them were rotten or doty; that the mill, which he moved for the purpose of sawing logs for defendant, was one that he had been running off and on for eight years; that he lost some time on account of bad weather; that he occasionally had a break down of machinery which stopped his mill temporarily; that during the term of his contract with defendant, he sawed nearly three million feet of lumber; that defendant company sold about two million feet of this output and that the lumber was worth from $11 to $12.50 per thousand feet. He further stated that the defendant lumber company offered him the lumber, which was still on hands, for $6.50 per thousand; that all of the oak lumber on defendant's yards had been sawed by him and that the lumber company had paid him for several hundred thousand feet which it had not sold; that he was paid for all the lumber he sawed.

M. L. Rhodes, a witness for plaintiff (a brother of the plaintiff), whose deposition was taken at Shreveport, Louisiana, testified that part of the time during the years 1899 and 1900, he was employed by the lumber company as its secretary; that the lumber company did not furnish logs in sufficient quantity to keep plaintiff's mill running all the time, partly for the reason that it had its own mill, which is a mill for the purpose of sawing pine timber—located at Greenville, Missouri—and had to haul logs by rail to both mills, and could not conveniently haul to plaintiff's mill and also its own on account of lack of train service; that in such case the lumber company supplied its own mill first; that the manufactured produce of the plaintiff's mill was salable lumber and satisfactory to the customers, to whom such produce was sold by defendant; that during the years

1899, 1900 and 1901, the demand for oak lumber of the kind sawed by the plaintiff was good; that as the agent of the lumber company, witness required plaintiff to restack some of the lumber piled by him; that Mr. Klotz, president of the defendant, objected to the manner in which the lumber had been piled by plaintiff and for this reason he required it to be restacked; that some of the lumber in the piles had been cut from unsound logs; that a portion of the lumber had been cut from sound logs and was not damaged.

He was asked why the lumber on hand had not been put on the market and sold and said that a large proportion of it was lumber that had been left over in filling orders, or sawing for particular sizes, and in so sawing, there would naturally be more or less lumber that would not apply on a particular order, and thus accumulate on hands.

He was asked, if by ordinary diligence the lumber company could have furnished sufficient orders to keep plaintiff's mill running all the time at satisfactory or reasonable prices, and said that it could, by using a better class of timber, and looking for a better class of lumber; and that while he was in charge of the sales department of the defendant, the company had orders which were not filled by him, and said, that he was subject to the orders of his superior officers, the president and general manager of the company, and that Mr. Klotz, president, directed him to return the orders and refuse to fill them; one objection he made, being on account of the price, and another reason, that at that time he did not want to handle much oak business; that the prices at which such lumber was sold were the prices made by the traveling salesmen; that he did not know of any complaint as to the manufacture of the lumber by the plaintiff. He further testified that plaintiff unloaded cars at the request of Mr. Newby, and sent in a bill for it; that twenty cents per car. was a reasonable price for unloading cars. .

On cross-examination, he stated that the mill operated by defendant was a large plant at Greenville, Missouri, for sawing pine lumber only. That the plaintiff was employed by defendant to saw up some of its oak timber to fill orders received by the lumber company for that kind of lumber; that the oak business was good until about March, 1900, when certain members of the lumber company objected to the contract with plaintiff and witness was instructed by the officers to handle the oak business lighter.

He said that they could have gotten orders for more oak lumber by cutting better timber, but they were using their better grades of timber to make ties; that the company, through himself as agent, furnished such orders to plaintiff for oak as would result in satisfactory prices to the lumber company, but that if it had been left to him, he would have accepted some orders which were returned by his superior officers. He further stated that the company had sawed at plaintiff's mill and kept in stock a large amount of lumber and that it had such lumber on hand for which it did not have orders, before the lumber was sawed; that such lumber accumulated and that they did not look forward to the probable trade and accumulate it for the purpose of having it on hand to fill orders, but that the custom was to send orders to the plaintiff's mill as they were received by the lumber company; that the defendant had furnished plaintiff logs to saw, at times when they had no orders on hand for the sawed product; and that the lumber not disposed of remained piled for five or six months; that Mr. Klotz, the president of the company, objected to the manner in which it was piled and in July or August, 1900, a large amount of lumber, which had been piled, or stacked at plaintiff's mill, was taken from that mill and brought to defendant's mill yard at Greenville, and there re-stacked, on strips, in that yard; that the lumber that was left at plaintiff's mill remained there in piles when it was or-

dered stacked on strips and this was done in January, 1901; that witness had it restacked because if it had remained longer, it was liable to be damaged.

William Cromer, a witness for plaintiff, testified that he had been in the lumber business for forty years and was familiar with the timber of southeast Missouri; that he had examined the lumber piled up at Greenville which had been sawed by plaintiff and said: "I don't think the lumber was good. Looked to be all of an inferior quality. It was a hard matter to determine what the quality of the logs were. There was a great deal of it rotten."

The evidence of Jeff Markham, an experienced lumber man, was to the same effect.

Defendant offered a demurrer at the close of plaintiff's evidence which the court overruled, whereupon defendant offered the following evidence:

W. L. Matthews testified that he had charge of the timber department of defendant lumber company at the time the contract was entered into between plaintiff and defendant; that he knew the character and kind of timber to be furnished plaintiff, was discussed with plaintiff; that the lands from which the timber was to be taken had been cut over for railroad ties prior to the establishment of plaintiff's mill; that the timber was an average grade and better than the timber lying east of St. Francis river.

Witness knew of the plaintiff burning some of defendant's lumber, which had been stacked, and heard Mr. Klotz tell plaintiff not to burn any more; that he, Klotz, wanted the lumber moved to the company's yards. He further testified that the lumber on hand which had not been sold was bad and poorly manufactured; that he got 30,000 feet of it for fencing purposes and most of it had to be retrimmed; that he also used 30,000 feet for bridge purposes on the railroad and that this had rotten ends, which had to be trimmed off; that

the lumber left in the yards was not merchantable lumber.

On cross-examination, he stated that it was in January, 1901, that plaintiff burned the lumber and that Klotz objected to it and wanted it stopped; that the fire made a good big blaze; that the 30,000 feet which witness used for fencing purposes and which he had retrimmed, was charged to the "farm account" of the lumber company, at $11 per thousand.

W. A. Reed testified that he was bookkeeper for the defendant at one time and manager of the sales department at another time; he had supervision of the orders received from the traveling salesmen of defendant and he sent orders to plaintiff to be filled at his mill.

Witness also submitted a schedule, of the amount of lumber manufactured by plaintiff and of the amount sold for each month during the life of the contract, which showed that plaintiff had manufactured, all told, 2,753,673 feet of which 2,165,849 feet had been sold, leaving on hand 858,560 feet.

He further testified that there were many complaints from customers of the lumber company as to the manufacture of the oak lumber sawed at plaintiff's mill, and in consequence of such complaints, defendant was compelled to allow deductions in prices to the customers; that such reduction or rebate was made on nearly every car shipped.

Witness referred to a number of customers who complained and a number of letters from customers were read in evidence, most of which letters witness testified were sent to plaintiff.

Witness further stated that the 800,000 feet of excess lumber sawed by plaintiff and for which defendant could find no orders, was still in the lumber company's yard, and that most of it was not properly trimmed; that fifty per cent of the ends were not square, and some pieces had rotten ends; that if a piece of timber

for sawing has a defect in it, it is the duty of the trimmer to cut off that end; that it makes a shorter piece of lumber, but a better piece; that the depreciation in price of oak lumber in defendant's yards at Greenville, on account of defects in manufacture, was about $5 per thousand, that he, witness, told the plaintiff they could not sell his lumber; that from May 1, 1900, to January 1, 1901, Mat Rhodes (plaintiff's brother) was in charge of the sales department of the defendant company, and during the time sold all the company possibly could; and that the utmost endeavors were made to sell and dispose of the oak lumber; that in January, 1901, Mr. Klotz came in as general manager, and he claimed the company was not getting enough for its oak; that about the middle of the winter and in January, 1901, they were not selling much oak, that Mr. Klotz had ordered the price higher and had said we must get what we could afford to sell it for, "I told Mr. Rhodes, the plaintiff, that we could not sell much more of his lumber, and the best thing he could do would be to get ready to move."

On cross-examination, witness said that he had been in the milling business for thirteen years and had had charge of the whole lumber business for defendant; that he had no experience in handling logs, had done no grading of lumber; that while at Grandin, Missouri, he had tried to learn all that he could about the lumber business.

Witness saw and copied the orders given plaintiff for grading. He said that a No. 1, common, board is a sound board with square edges, free from rot, that would stand a wind shake if it did not go through, and was one that could be used for ordinary building purposes; that a piece of board sixteen feet long, that had a wane about three feet and the wane not going half way across the edge of the piece would be admissible as No. 1; that the lumber ought to be free from knots.

He stated that the plaintiff could have manufac-

tured the lumber better; that the reason why it had rotten ends was because the plaintiff did not cut the ends off; if he had had sound timber they would not have been rotten. Witness told Rhodes, the plaintiff, that the company would expect him to cut all he could off of a log that would go in on an order and cut the rest to the best advantage; that witness had offered to sell the lumber stacked in defendant's yards for $5.50 per thousand.

His attention was called to a clause in one of the letters offered in evidence, in which it was stated that they found the count all right, but the grade badly off, and his attention was also called to another letter where the customer had complained of the car of lumber as being rotten and unsalable and an offer made on the car at $18 per thousand. Witness stated that there was some oak lumber shipped, about 350,000 feet, which was cut at Johnson's mill; that there was also some objection to it, but it was not included in Rhodes' account; that all the oak lumber was shipped out in the name of the Holladay-Klotz Land & Lumber Company; that the plaintiff shipped none in his name; that the lumber company was not making a good profit on the oak, and Rhodes was not to blame for not filling orders when he had no logs, as the failure to suply logs was the fault of the lumber company.

J. H. Martin testified that he was the traveling salesman for defendant lumber company, traveling in Kansas, Nebraska and western Missouri; that the grade of oak lumber used in that territory was known as No. 1, common; that he had fifth or sixty customers to whom he sold oak lumber; that as salesman, he made the best possible effort to sell such lumber, and was selling what he understood was the output of plaintiff's mill; that up to March, 1901, he lost several customers who complained that the grade of lumber was inferior. About two-thirds of his customers complained of the

manufacture of the lumber and said it was not sawed properly.

Witness found that in most instances the complaints were just, in many cases the lumber had waney edges and was doty. When these complaints came in, the witness would investigate by instructions of the lumber company and would have to make allowances for the defects. In one case he lost $15, in another case $11 on a car, and in another $30, and another $35. When he sold a customer a car of bad lumber he lost the customer and was not able to sell again to him. Witness named a number of firms who complained, among them, Mr. Price, Harrisonville, Missouri, Holton Lumber Company, Seneca, Kansas, Talmage Lumber Company, Talmage, Nebraska, Funnel Lumber Company, Lawrence, Kansas, and Layson Lumber Company, Maryville, Kansas.

On cross-examination witness stated that the party to whom the $35 allowance was made did not want the car at all, but was induced to take it. That sales of oak lumber during the years 1899 and 1900 were good and prices fair; that he had from time to time received letters from defendant requesting him to get orders for oak lumber, and that he did his best to get such orders; that he worked his territory diligently and got no more orders than he sent in; that in one instance he made a sale of select or clear lumber and it was something that the company could not have manufactured and was not accepted.

On redirect examination witness stated that he had made special effort to push the sale of oak lumber, and on further cross-examination stated that the lumber company got a good price for oak lumber, but that the eight cars mentioned by him were not all the complaints received; that such complaints were general; that witness did not have his order book with him and could not give them more in detail.

J. M. Wilson testified that he was also a traveling

salesman for defendant lumber company, taking a part of Missouri and southern Kansas; that there was a good demand for oak lumber known as No. 1, common; that witness had thirty or forty customers; that some of the lumber sold by him for defendant came up to this grade and some did not; that he had some complaints on account of the grades and investigated them, and advised the lumber company to allow them as the oak lumber was irregularly sawed. He said he had one or two compliments on the lumber from parties who said it was well manufactured. Witness used his best endeavors to sell but at the end of his two years work the trade was not as good as it previously had been. The demand was good but there were complaints as to the manufacture and quality of the stock; that the timber from which oak lumber is manufactured may be good but if it is not properly sawed it does not come up to the grade known as No. 1, common.

The lumber company urged witness to get all the orders he could and he had letters from them to that effect. The territory in which he worked was good for the sale of oak, as it had no oak supply of its own.

On cross-examination witness stated that he could not say, without his order book, how much he sold, nor remember the number of complaints received on account of bad manufacture. He recalled six or eight parties and gave the names and the particulars of their complaints; such complaints being chiefly that the lumber was badly manufactured. In nearly every case of such complaint the customer refused to buy any more lumber from witness. He sold two cars to a man named Taylor which were not filled by the lumber company on account of the price. At a lumber convention in Kansas City, in January, 1901, a special effort was made by him to place oak lumber on the market, and he sold three cars during that convention. He continued his efforts until the oak mill of Mr. Rhodes was closed

down. He sold·some lumber after this convention, but he could not tell how much without his order book.

G. S. Weber testified that he was city inspector of lumber in St. Louis, Missouri, and had been for twenty years and was familiar with grades of hard wood lumber. He inspected the piles of oak lumber in defendant's yards at Greenville, Missouri, during May, 1902; inspected all of it. He found some of the lumber thicker at one end than the other. This indicated bad sawing. The lumber was not properly edged, and had more wane than was allowable, generally speaking it was rough lumber and the defects were those of manufacture and were such as to depreciate the grade of the lumber about 55 per cent; that there were about 500,000 feet of it.

On cross-examination he stated that in his business as an inspector he neither bought nor sold lumber, but was appointed by the lumberman's exchange of the city to inspect lumber; that he got his orders for such inspection, usually from the secretary of the exchange; that he had worked over all the lumber yards in St. Louis, and did not see any lumber known as No. 1 common in the pile at Greenville, Missouri; that Mr. Klotz asked him after he had come to Greenville to look at this lumber and some of it was rotten.

Weber's evidence was corroborated by A. Newby, George Wheeler, Mat Kelly, Phillip Sternfells, W. E. Steuwe, William Foley, William Carter and Frank Hackworth, all experienced lumber men.

Eli Klotz testified that he was president of the Holladay-Klotz Land & Lumber Company; that Rainwater preceded him as president, that so far he knew the company had at all times used reasonable efforts to sell the output of Mr. Rhodes' mill; that during the entire time he had been manager in the office, orders had been procured for that mill; that they had men on the road for the purpose of selling oak lumber and efforts were made to get orders from the salesmen; that

from the time he took charge of the company's business in January, 1901, there was a falling off in the trade for oak lumber; and also a falling off in the price; that lumber sold for less in February than they got for it in January. He stated that the timber was worth $1.50 per thousand, hauling logs from the woods to the railroad about $3.50, loading them on the cars 50 cents, and bringing them in $1 per thousand; that the company paid Mr. Rhodes $3 a thousand to manufacture them, making $10; that during the entire part of the term of the contract with plaintiff, the lumber netted the company from $9 to $9.60 per thousand; that he knew the character of the logs furnished plaintiff's mill and it was good material; that Mr. Rhodes, plaintiff, told witness that the logs furnished him were too good for the material they were used for and that No. 1 material was furnished him and ought to be put into wagon material. This was in February, 1901; that about the first of January he went out on horseback near plaintiff's mill and found that plaintiff was burning some of the company's lumber stacked there; that he told plaintiff that he had burned over 100,000 feet and that plaintiff said it was not over 60,000 feet; that lumber at that time was selling at $11 per thousand; that the company always furnished Mr. Rhodes such orders as it received; that in the month of February witness had an order for switch ties at twenty-five cents, and after they were shipped they only netted the company $9.60 and at that time they could get a few more orders. Witness told plaintiff that if he was willing to take less to manufacture them, they could get him more orders for ties, and he said he wouldn't do it; that defendant continued to furnish him with logs right along after that during the entire term of the contract; that lumber that had accumulated and for which defendant had no orders, amounted to 800,000 feet; that it was not trimmed right, nor sawed even; that it would have to be retrimmed to make merchant-

able lumber; that the company had tried to sell this lumber and witness had offered it to Mr. Rhodes for $6.50 per thousand and was willing to sell to him still at that price. Witness knew of complaints as to character of lumber shipped, and that they came frequently. He also stated that he made an objection to the way the lumber was stacked while at the yards of plaintiff's mill and he had it loaded on the cars and brought down to the company's yards and restacked it there; that the way it had been piled by plaintiff also depreciated it in value by making it doty or dry rot.

On cross-examination witness stated that he took charge of the company's business January 17, 1901, and that the contract with plaintiff was in force after that time until the fifteenth of July, 1901; that the lumber company had never attempted to avoid the contract, but that it had used due diligence to furnish plaintiff's mill with good logs; that they had two traveling salesmen and also the St. Louis office and also took orders for lumber at the office in Greenville; orders covered the States of Nebraska, Kansas and Missouri; that the logs furnished plaintiff's mill were good and that plaintiff said the timber furnished him was good; that railroad ties are made out of No. 1 timber and plaintiff made some railroad ties; that the orders for ties spoken of by Mr. Rhodes in February were for the M. K. & T. Railroad Company.

He stated that good logs are not rotten, but they may have wind shakes in them; that the lumber burned by plaintiff (about 80,000 feet) ought to be worth $10 per thousand; that when the lumber company was furnishing logs to its own mill, plaintiff's mill might have been idle if the lumber company had no orders for oak, but that the company always gave plaintiff logs as soon as they got orders for lumber. Witness stated that he turned down orders frequently because the price was not satisfactory. Asked what the lumber on hand was

worth, he said the company would take $6.50 per thousand for it.

This was all the testimony on the part of defendant.

Plaintiff was then recalled, and referring to a memorandum book, which he had, stated that he cut on February 16, 1901, 11,503 feet on a ten hours' run at his mill; that his usual run was eleven hours; that he cut on the eighteenth, 13,079 feet, on the twentieth and twenty-first he had no logs, and on the next day cut 7,753 feet. Plaintiff said he had examined lumber in defendant's yards and was unable to state how much of it was waney. He said he spoke to Klotz about their cutting better timber for ties than they did to make good lumber out of, and that this was for the M. K. & T. Railway Company; that he used 60,000 or 80,000 feet in making ties; that the logs furnished to make the ties were much better logs than those brought in ordinarily; that about one-half of the lumber in the yards would rate as No. 2, common; that the accumulation of this lumber was on account of sawing into stock lumber that could not be used on orders; that he told Mr. Klotz that he burned about 60,000 feet.

At the conclusion of the testimony the following occurred as shown by the bill of exceptions:

"The plaintiff now asks the court to put the jury in charge of the sheriff and permit the jury to look at this lumber.

"By the Court: 'I will not do this unless there has been an agreement. I am not going to send them down there and have an exception made here to it.'

"The defendant made this proposition: That they would let the jury go by themselves and look at the lumber.

"The plaintiff made this proposition. That they would pick a man and the defendant would pick a man to go with the jury.

"This is agreed to and the defendant chose Mr. W. L. Matthews, the plaintiff selects Mr. Rhodes.

"Says the court to the jury: 'I will let you go down there and look at that lumber that was sawed by the plaintiff in this case. I desire to instruct you not to discuss this case at all, not to comment whatever on what you find down there, just observe it quietly and, on the other hand, the gentlemen who are accompanying you are instructed not to talk to you about the defects of this lumber, and these instructions must not be disobeyed in the least by either of you.'

"The jury proceeds to the lumber yard.

"This was all the evidence in the case.

"And thereupon the defendant requested the court to give the following instruction:

" 'The court instructs the jury that under the pleadings and all the evidence offered in the case, plaintiff is not entitled to recover as to the first cause of action stated in the petition, and as to the first cause of action your verdict must be for the defendant.' "

The court refused the above instruction and over the objection of defendant gave the following instructions for plaintiff:

"1. The court instructs the jury, that by the contract sued on and offered in evidence, defendant agreed to furnish plaintiff with logs out of which merchantable lumber could be manufactured, sufficient in number to run his mill daily, barring the ordinary hindrance incident to the business, unless you should find that defendant, after honestly trying to sell the output of the plaintiff's mill at market price, could not do so, then plaintiff should only expect and receive logs enough to supply the market furnished by the defendant, it continuing, however, to make the same honest effort to sell; but if you should find that defendant furnished an inferior quality of logs, which plaintiff manufactured in a workmanlike manner and handled according to the contract and orders of defendant, and that the

lumber so produced, or much of it, was unsalable be-
cause made of bad and unsuitable timber, then your
verdict should be for the plaintiff, for the reason that
such unsalable lumber was occasioned by the fault of
the defendant.

"2. If you find for the plaintiff on the first count
in the petition, which relates to the contract sued on,
you will assess his damages at not to exceed four thou-
sand, two hundred and ninety-eight dollars and seventy
cents, as you may consider from the evidence he sus-
tained by reason of defendant's failure to comply with
the terms of its contract with him, as construed in the
first instruction.

"3. The court instructs you that if you find from
the evidence that plaintiff unloaded four hundred and
twenty-three cars of logs for defendant at his mill, and
that he was employed by defendant to do the work, then
you will return a verdict for him in such sum as you
consider the work reasonably worth, not to exceed
twenty cents per car, or eighty-four dollars and sixty
cents. This instruction relates to the second count of
plaintiff's petition, and you will return a separate ver-
dict concerning it."

The court also gave one on the credibility of the
witnesses which was not objected to.

For defendant the court gave the following instruc-
tions:

"4. The court instructs the jury that the plaintiff
in the first cause of action stated in his petition claims
damages only because of the alleged failure of defend-
ant to furnish him with a sufficient quantity of logs to
enable his mill to be run all the time during the term
of the contract and you can not allow plaintiff any
damages on account of the defective character of logs
furnished by defendant (if you find from the evidence
the logs were defective) but the evidence as to the kind
of logs furnished should be considered by you in de-
termining defendant's counterclaim for damages, on

account of the alleged improper sawing or manufacturing of the logs into lumber.

"5.  The court further instructs the jury that if you find from the evidence that about the first of January, 1901, the plaintiff set fire to and burned any lumber belonging to defendant, which had been sawed by plaintiff, then you will allow defendant as damages on its second counterclaim, such sum as you may find to be the reasonable value of the lumber so burned and destroyed.

"7.  The jury are further instructed that under the contract read in evidence, the defendant was only required to furnish logs to plaintiff's mill in such numbers or quantity as suited the reasonable convenience of defendant and to make deliveries of such logs in accordance with the sales of lumber, which it might with reasonable effort and diligence be able to make from time to time, and if you find from the evidence that it furnished more logs than it could with reasonable effort have disposed of when sawed into lumber, and that notwithstanding such effort to sell a large amount of lumber accumulated on its hands, for which it has found no market, then you will find the issues for defendant, as to the first cause of action in plaintiff's petition.

"8.  The court instructs the jury that the burden of proof is upon the plaintiff to establish to your satisfaction by a preponderance (or greater weight of the evidence) his case as stated in the petition, and unless you find that it has been so established, you will find for defendant as to the cause of action stated in plaintiff's petition.

"The court further instructs the jury that if you find from the evidence that the plaintiff failed to saw or manufacture the logs furnished by defendant to him in a workmanlike manner or failed to saw it smooth and even, or failed to stack it in a workmanlike manner so as to protect it from decay or injury, and that in

consequence of such failures on plaintiff's part a large amount of lumber was sawed by plaintiff for which defendant could find no sale, or that it was piled by plaintiff in such a manner that it was exposed to the weather and became decayed or injured, and that several hundred feet was left upon defendant's hands in a damaged or injured condition, and that this resulted from the negligence of the plaintiff, then you will allow defendant as damages, in his first counterclaim such sum as you may find to be the depreciation in value of the said lumber, not exceeding $3,200.

The court refused the following instruction asked by defendant:

"The court instructs the jury that under the written contract read in evidence, the defendant was only required to furnish and supply oak saw logs delivered at plaintiff's mill in numbers limited by the reasonable convenience of said defendant, and to make such sales of said oak lumber as it was able to make from time to time, and that the defendant therefore, had the right to furnish such supplies of logs as it deemed proper, and you cannot find a verdict for the plaintiff as to the first cause of action stated in plaintiff's petition unless you find from the evidence that defendant willfully or intentionally refused to supply logs for plaintiff's use."

The jury returned the following verdict:

"We, the jury, find the issues for the plaintiff on the first cause of action stated and assess his damages at the sum of $1,500, one thousand five hundred dollars, and we find the issues for the plaintiff on the second cause of action stated and assess his damages at the sum of $84.60, eighty-four and 60-100 dollars.

"We, the jury find the issues for the plaintiff on the first counterclaim of defendant.

"And we further find the issues for the defendant on the second counterclaim and assess his damages at the sum of three hundred dollars (300)."

A timely motion for new trial being of no avail, defendant appealed.

BLAND, P. J. (after stating the facts as above).— 1. Plaintiff offered evidence in chief tending to prove that the defective and unsalable condition of the 800,000 feet of lumber resulted from the unsound and defective logs, furnished him by defendant, out of which the lumber was sawed. This character of evidence was objected to by defendant on the ground that there was no averment in the petition that there were any defects in the timber.

The answer alleged that the defects in the lumber left over was in manufacturing of it by defendant.

The reply tacitly admitted that the lumber was defective. To avoid the force of this admission, it is alleged that the defects were to be ascribed to the rotten and defective character of the timber furnished by the defendant out of which it was sawed. In this condition of the pleadings, we think, that it was not only proper, but that the burden was on plaintiff to prove to the reasonable satisfaction of the jury that the defective and unmerchantable quality of the lumber was the fault of the defendant, in furnishing rotten or doty timber, and that the court properly admitted testimony in chief to locate the responsibility for the defective lumber.

2. It is contended by defendant that the defendant, under the contract, was constituted the judge as to the quality of the timber to be supplied plaintiff for manufacturing lumber, and when prices for lumber were satisfactory, and that it is only liable for an intentional violation of the contract.

The language of the contract, in respect to furnishing logs, is, "The said party of the first part further agrees to furnish and supply oak saw logs, delivered at Skidway at said mill, in numbers to be limited by the reasonable convenience of the said party of the

first part, and make such deliveries by the sales of such oak lumber that the said party of the first part may be able to make from time to time. It being understood that the said party of the first part will endeavor to supply logs sufficient to enable said sawmill of the party of the second part to run all the time and cut such lumber as said party of the first part can sell each month; said party of the first part agrees to log said mill to its capacity to cut, limited only by the amount of lumber said party of the first part shall be able to sell at satisfactory prices.''

The purpose of the parties was to manufacture and sell marketable lumber. To furnish saw logs for this purpose would require such logs as could be converted into merchantable lumber. The quality of the logs was, therefore, not left to the whim, or caprice of the defendant, but it was obliged to furnish saw logs from which the plaintiff could saw merchantable lumber.

What is meant by the phrase, ''satisfactory price,'' in the contract should receive a reasonable construction; a price should be construed satisfactory which would yield the defendant a reasonable profit over and above the gross cost of the lumber to it, plus the reasonable value of the timber and the cost of making sales of the lumber.

A fair construction of the contract would require the defendant to furnish timber from which could be manufactured salable lumber, to make reasonable efforts to put sound and salable lumber on the market and, if by such effort sales at reasonable profits could be made, to keep plaintiff's mill continuously running, plaintiff was obliged to furnish sufficient saw logs to keep it going. On the other hand, plaintiff was obliged, when furnished with sound timber, to saw it in a workmanlike manner and of such dimensions as required by the defendant.

The instructions given substantially adopted this

view of the contract and we think fairly submitted the issues to the jury.

The evidence was conflicting and much of it is contradictory, but that plaintiff made out a prima facie case, we have no doubt and he was entitled to have his theory of the case submitted to the jury on the evidence adduced by him.

With the weight of the evidence, we are not concerned; to weigh it and to make proper deductions therefrom was the peculiar and exclusive province of the jury.

The refused instruction asked by the defendant put a construction on the contract opposed to the views herein expressed and we think was properly refused by the trial court.

3. The first instruction for plaintiff authorized a recovery, if defendant did not sell lumber for the reason that it made no honest effort to do so and, second, if it failed to sell lumber because it furnished an inferior and defective quality of logs. The second breach of the contract is not alleged in the petition. For this reason it is contended by defendant that plaintiff was allowed to recover upon a cause of action not alleged in the petition.

As an excuse for not selling lumber, the answer set up that it was badly manufactured. The reply denied that the lumber was badly sawed, but tacitly admitted that much of it was unsalable and alleged as a reason for its unmerchantable quality, that the logs furnished by defendant and the timber from which it was sawed was doty and rotten. This allegation of the reply shifted the responsibility for the unmerchantable lumber from plaintiff to defendant. It also contains an allegation of a breach of the contract not alleged in the petition, to-wit, the furnishing of doty or rotten logs by defendant from which merchantable lumber could not be sawed. It does not contradict any of the allegations of the petition, nor is it inconsistent with the

petition, nor nowhere evinces a purpose on the part of the pleader to abandon the breach of the contract alleged in the petition as constituting plaintiff's cause of action. It could not, therefore, be stricken out on the ground that it was a departure from the petition. Cravens v. Gillilan, 73 Mo. l. c. 528; Chemical Co. v. Lackawanna Line, 70 Mo. App. 274. Nor does it contain redundant matter, but contains new matter not inconsistent with the petition, constituing a defense to the counterclaim set up in the answer and was therefore allowable under section 607, Revised Statutes 1899. Coombs Com. Co . v. Block, 130 Mo. 668. But the reply was not confined at the trial to the legitimate functions of a reply, but was used, as is shown by instructions numbers 1 and 2 given for the plaintiff, in aid of the petition by authorizing a recovery for a breach of contract in furnishing of rotten or doty logs by the defendant. Under the statute (sec. 607, supra) the office of a reply is to put in issue new matter alleged in the answer by a general or special denial thereof, and the pleader may allege in the reply any "new matter, not inconsistent with the petition, constituting a defense to the new matter in the answer." But a reply can not be used in aid of the petition by introducing for the first time a new cause of action or an additional cause of action, nor to engraft on the petition a material allegation omitted therefrom. McMahill v. Jenkins, 69 Mo. App. l. c. 281; Crawford v. Spencer, 36 Mo. App. 78; Pattison on Missouri Pleading, secs. 676, 763, 880. And it was error to instruct the jury, as was done in the first instruction given for the plaintiff, that the furnishing of defective logs by defendant was a breach of the contract entitling plaintiff to recover.

4. The second instruction for plaintiff, in respect to the measure of damages, is also erroneous. The measure of damages in actions for breach of contract is a matter of law for the court to declare in its instructions to the jury, not a matter for the jury to guess at

or speculate upon.   1 Sedgwick on Damages (8 Ed.),
sec. 31; Morrison v. Yancey, 23 Mo. App. 670; Williams
v. Iron Company, 30 Mo. App. 662; Wilburn v. Rail-
way, 36 Mo. App. 203; Flynt v. Railway, 38 Mo. App.
94.   Compensation for the actual loss resulting from
the breach is what the law aims to give.   Albers v.
Merchants' Exchange, 138 Mo. 140; Chalice v. Witte,
81 Mo. App. 84.   The compensation on the first count
of the petition would be plaintiff's loss of the net prof-
its he would have realized from the operation of his
mill if he had been supplied with saw logs according
to the terms of the contract.   American Pub. & Engr.
Co. v. Walker, 87 Mo. App. 503.   For the errors herein
noted the judgment is reversed and the cause remanded.
*Reyburn* and *Goode, JJ.,* concur.